UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **CARLA M. MCAFEE**, | **2:19-CV-12956-TGB-DRG** |
| Plaintiff, | |
| vs. | **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 41)** |
| **HURON CLINTON METROPOLITAN AUTHORITY**, | |
| Defendant. | |

Plaintiff Carla M. McAfee ("McAfee") brings this lawsuit against Defendant Huron Clinton Metropolitan Authority ("Huron Clinton") for retaliatory discharge under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a), and the Michigan Elliott-Larsen Civil Rights Act ("ELCRA"), M.C.L. § 37.2701(a). This Court previously dismissed McAfee's sexual harassment and hostile work environment claims under these statutes. ECF Nos. 28, 33. As such, only McAfee's claim of retaliatory discharge remains pending. On April 22, 2022, Huron Clinton moved for summary judgment on the retaliatory discharge claim. ECF No. 41. For the reasons detailed below, Huron Clinton's Motion for Summary Judgment is **GRANTED**, and the case is **DISMISSED with prejudice.**

1

## I.     INTRODUCTION

Huron Clinton hired McAfee in February 2016 as a Multi-Media Design Supervisor. Defendant's Motion for Summary Judgment, ECF No. 41, PageID.371; Plaintiff's Amended Response in Opposition to Summary Judgment, ECF No. 44, PageID.1158. When she first started at Huron Clinton, McAfee reported directly to Huron Clinton Director George Phifer. ECF No. 44, PageID.1158.

In June 2017, Huron Clinton suspended Phifer pending investigation of sexual harassment allegations made against him by a Huron Clinton employee. ECF No. 41, PageID.371–72. In Phifer's absence, Michael Reese was appointed Interim Director of Huron Clinton. *Id.* at PageID.372. Soon after, McAfee approached the Huron Clinton investigator to discuss the alleged sexual harassment she experienced while working for Phifer. ECF No. 44, PageID.1158.

In October 2017, McAfee met with the U.S. Equal Employment Opportunity Commission ("EEOC") to file a charge alleging sexual harassment perpetrated by Phifer, race discrimination, and retaliation stemming from McAfee's participation in the Phifer investigation. ECF No. 44, PageID.1159, PageID.1165. Around the time that she began conferring with the EEOC, McAfee notified Huron Clinton Deputy Director Dave Kirbach and Interim Director Reese that she was in the

process of filing a charge. *Id.* at PageID.1165; ECF No. 44-6, PageID.1195.

In early November 2017, McAfee alleges that she attended a meeting with Reese, Kirbach, and Jason Kulongowski (President of the Huron Clinton Employees' Association) to discuss McAfee's EEOC complaint. ECF No. 44, PageID.1165. McAfee alleges that at this meeting, Reese attempted to persuade her into dropping the EEOC complaint because it would negatively impact Kirbach's candidacy for the Huron Clinton Director position. *Id.* McAfee continued to pursue the EEOC charge, which was finalized on November 28, 2017. *Id.* at PageID.1159.

In December 2017, Reese met with McAfee to discuss a disagreement over a minor stylistic issue in McAfee's work product. *Id.* at PageID.1166; Reese Dep. (Jan. 27, 2022), ECF No. 41-20, PageID.895–97. When McAfee refused to acquiesce to Reese's preferred style, Reese insisted that she do as he asked. ECF No. 41-2, PageID.899. McAfee also alleges that Reese became visibly angry during this meeting and yelled at her about correcting the issue. ECF No. 44, PageID.1166.

In April 2018, McAfee alleges that Kirbach told her that Huron Clinton management was displeased with McAfee's EEOC charge and would fire her if she did not withdraw the charge. *Id.* at PageID.1167. McAfee continued to pursue the charge. Also in April 2018, Reese was replaced as Huron Clinton Director by Amy McMillian. ECF No. 41,

PageID.373. From that point, McMillian, not Reese or Kirbach, managed McAfee's relationship with Huron Clinton. *See* McMillian Dep. (Jan. 25, 2022), ECF No. 41-11, PageID.749.

On June 13, 2018, McAfee faxed documents related to her EEOC charge to Huron Clinton's counsel. ECF No. 41-9, PageID.635. In one document, an email from McAfee to an EEOC investigator dated April 26, 2018, McAfee reported feeling "suicidal for the last couple weeks" because of the workplace hostility she perceived. *Id.* at PageID.636; ECF No. 44, PageID.1160. On the evening of June 13, 2018, McMillian emailed McAfee to express her serious concerns about McAfee's mental health, and urged McAfee to seek emergency care if necessary. ECF No. 41-12, PageID.791. McMillian also informed McAfee that she would meet with her the next morning to discuss the matter. *Id.*

On June 14, 2018, McMillian met with McAfee to reiterate her concern for McAfee's wellbeing and the gravity of McAfee voicing suicidal ideations. ECF No. 41, PageID.374; ECF No. 44, PageID.1160. During their meeting, McMillian told McAfee that she would be placed on paid administrative leave for a minimum of 15 days. ECF No. 41, PageID.374; ECF No. 44, PageID.1160. McMillian documented the decision in a follow-up email reminding McAfee that she could not return to work until she "provide[d] authorization from a certified medical physician indicating [that McAfee was] able to safely return to the workplace" and perform her job duties. ECF No. 44-2, PageID.1185. McMillian also noted

4

that Huron Clinton "may also require additional medical certification of your overall health, such as a fitness for duty examination, before [McAfee could] return to the workplace." *Id.*

Near the end of McAfee's 15-day leave period, on July 2, 2018, McMillian notified McAfee that she had been scheduled for a Fitness for Duty examination with Dr. Linda Forsberg, a psychologist hired by Huron Clinton to evaluate McAfee. ECF No. 41-21, PageID.396. As part of Huron Clinton's Fitness for Duty requirement, Dr. Forsberg saw McAfee on July 3, July 12, July 20, and July 30, 2018 to assess her fitness to return to work. ECF No. 41-18, PageID.807.

The record reflects that Dr. Forsberg issued two opinions on McAfee's psychological fitness to Huron Clinton. On July 24, 2018, Dr. Forsberg reported to McMillian that McAfee was not fit for duty, and should be reevaluated before returning to work. ECF No. 41-17, PageID.804. Then on August 27, 2018, after meeting with McAfee four times in July 2018 for five and a half hours of clinical interviewing and six hours of written testing, Dr. Forsberg concluded that McAfee would still be unfit for duty by September 4, 2018. ECF No. 41-18, PageID.806, PageID.809.

Meanwhile, McAfee also received mental health treatment from other therapists and medical professionals. *Id.* at PageID.814. But on July 18, 2018, McMillian told McAfee that while Huron Clinton "respect[ed] any choice [McAfee made] in selecting a counselor," Huron

5

Clinton required McAfee to obtain return-to-work authorization from a "***board-certified medical physician, preferably a psychiatrist***." ECF No. 41-21, PageID.941. McMillian reminded McAfee that this medical certification was necessary to ensure that McAfee could "safely return to the workplace and perform the tasks associated with [her] position." *Id.* McMillian also identified resources to help McAfee find a physician to fulfill the medical authorization requirement. *Id.*

On July 19, 2018, McAfee told McMillian that she was having difficulty scheduling psychiatry appointments, and the earliest psychiatric appointment she could find was not until September 2018. *Id.* at PageID.940. McMillian continued to correspond with McAfee over the next week regarding McAfee's struggle to find a psychiatrist. *Id.* at PageID.943–46. But given that McAfee could not satisfy the medical certification requirement by the end of July, McMillian extended McAfee's paid administrative leave through August 10, 2018, and mentioned the possibility of another extension if McAfee could not be cleared by August 10. *Id.* at PageID.946. On July 30, 2018, McAfee expressed her gratitude to McMillian for providing the paid leave extension, and indicated that she had made progress finding mental health counselors who could provide a psychiatry referral. *Id.* at PageID.947.

By August 9, 2018, McAfee was still unable to obtain medical authorization to return to work. McMillian then extended McAfee's paid

administrative leave through September 4, 2018. *Id.* at PageID.949.
McMillian also noted that if McAfee could be cleared before September 4,
Huron Clinton "will be truly happy to have [McAfee] back." *Id.* McAfee
again thanked McMillian for the extension. *Id.*

On August 29, 2018, McMillian told McAfee that her "paid
administrative leave had "come to an end," but McAfee was eligible for
"short term disability insurance, FMLA[,] and other options until [she
could] return to work." *Id.* at PageID.951. Over the next few weeks,
McAfee discussed submitting her FMLA and short-term disability leave
paperwork and scheduling an EEOC mediation on her pending charges
with McMillian. *Id.* at PageID.958–60.

Over six months later, on March 15, 2019, McMillian sent McAfee
a letter explaining that McAfee had exhausted paid and unpaid leave, as
well as the benefits provided under her Bargaining Unit Agreement. ECF
No. 41-19, PageID.825. The letter further advised McAfee that if she had
"a desire to return to work and [had] been cleared to return with an
authorization from a certified medical physician," she would need to
contact McMillian by April 5, 2019. *Id.* McMillian informed McAfee that
if she was unable to return to work by April 19, 2019, McAfee would be
terminated at that time. *Id.*

McAfee did not respond to the March 15, 2019 letter, nor did she
communicate with McMillian by April 5, 2019. McAfee Dep. (Jan. 24,
2022), ECF No. 41-6, PageID.536–37. Therefore, McAfee's employment

at Huron Clinton was formally terminated on April 19, 2019. ECF No. 44, PageID.1164. On that same day, McAfee received her right to sue letter from the EEOC. Complaint, ECF No. 1, PageID.3.

## II.     LEGAL STANDARD

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact such that the movant is entitled to a judgment as a matter of law." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013); *see also* Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

On a motion for summary judgment, the Court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted); *Redding v. St. Eward*, 241 F.3d 530, 531 (6th Cir. 2001).

The moving party has the initial burden of demonstrating an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party carries this burden, the party opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587. The trial court is not required to "search the entire record to establish that it is

8

bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989). Instead, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001). The Court must then determine whether the evidence presents a sufficient factual disagreement to require submission of the challenged claims to the trier of fact or whether the moving party must prevail as a matter of law. *See Anderson*, 477 U.S. at 252.

## III.      DISCUSSION

### A. Retaliatory Discharge Under Title VII and ELCRA

McAfee's sole remaining claim is that of retaliatory discharge under Title VII and ELCRA. Because the elements of retaliation under ELCRA are "identical to the Title VII analysis," *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 472 (6th Cir. 2012), the Court focuses solely on Title VII authorities.

Title VII prohibits an employer from discriminating or retaliating against an employee for opposing an unlawful employment practice, "or because [she or] he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e-3(a). Likewise, ELCRA prohibits retaliation or discrimination "because the person has opposed a violation of [ELCRA], or because the person has made a charge, filed a complaint, testified,

assisted, or participated in an investigation, proceeding, or hearing" under ELCRA. M.C.L. § 37.2701(a).

To establish a prima facie case of retaliation under Title VII, a plaintiff must show:

> 1) [she or] he engaged in activity that Title VII protects; 2) defendant knew that [she or] he engaged in this protected activity; 3) the defendant subsequently took an employment action adverse to the plaintiff; and 4) a causal connection between the protected activity and the adverse employment action exists.

*Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003). With respect to the causation element, "a plaintiff making a retaliation claim under § 2000e–3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).

A plaintiff may prove their retaliation case through direct or indirect evidence. *Imwalle v. Reliance Med. Prod., Inc.*, 515 F.3d 531, 543 (6th Cir. 2008). Direct evidence "is that evidence which, if believed, requires no inferences to conclude that unlawful retaliation was a motivating factor in the employer's action." *Id.* at 543–44. If a plaintiff has direct evidence of retaliation, the employer can avoid liability only by showing "by a preponderance of the evidence that it would have made the same decision absent the impermissible motive." *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 648 (6th Cir. 2015) (quoting *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 346–47 (6th Cir. 2012)).

Just as with other Title VII claims based on indirect or circumstantial evidence, the *McDonnell Douglas* burden shifting framework also applies to retaliation claims that lack smoking gun evidence. *Imwalle*, 515 F.3d at 544. Assuming the plaintiff makes a prima facie case of retaliation, "the burden [of production] shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse action." *Abbott*, 348 F.3d at 542 (alteration in original) (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 562 (6th Cir. 2000)). The plaintiff may then attempt to show "that the proffered reason was a mere pretext for discrimination" by demonstrating that the employer's reason "1) has no basis in fact; 2) did not actually motivate the adverse action; or 3) was insufficient to motivate the adverse action." *Id.*

### 1. McAfee Lacks Direct Evidence of Retaliation

As McAfee points out, determining whether she has presented direct evidence of retaliation "is of importance, because a direct evidence claim is removed from" the *McDonnell Douglas* burden-shifting framework. *Chattman*, 686 F.3d at 346. Put simply, "direct evidence proves the existence of a fact without any inferences or presumptions." *Norbuta v. Loctite Corp.*, 181 F.3d 102 (6th Cir. 1999). For a Title VII retaliation claim, the direct evidence must "show both 'blatant remarks' revealing the [employer's] retaliatory intent," and that the retaliatory intent caused the employer to take adverse employment action. *Mansfield v. City of Murfreesboro*, 706 F. App'x 231, 235 (6th Cir. 2017);

*see also Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 383 (6th Cir. 2002) ("When determining whether proffered evidence constitutes direct evidence of discrimination, we consider whether the evidence, if believed, compels the conclusion that retaliatory animus played a part in the challenged decision.").

But under Federal Rule of Civil Procedure 56(c)(1)(B), the moving party can argue that their opponent fails to show a genuine dispute of material fact where the "adverse party cannot produce admissible evidence to support the fact." For example, "a court may not consider hearsay when deciding a summary judgment motion." *Tranter v. Orick*, 460 F. App'x 513, 514 (6th Cir. 2012). While a plaintiff can rely on deposition testimony to survive summary judgment, "even if the deposition itself is not admissible at trial," they must show that the evidence is otherwise admissible through "substituted oral testimony." *Bailey v. Floyd Cnty. Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997).

Here, McAfee argues that summary judgment must be denied because she has proffered direct evidence of retaliation. Specifically, McAfee relies on oral statements made by Huron Clinton Deputy Director Kirbach conveying to her that Huron Clinton management would fire McAfee if she did not withdraw her EEOC charge. ECF No. 44, PageID.1171.

But the Court cannot consider this evidence to support McAfee's position on summary judgment because McAfee has failed to

demonstrate its admissibility at trial. Unfortunately, due to his passing in August 2020, Kirbach has not been deposed and cannot testify at trial. Defendant's Reply in Support of Summary Judgment, ECF No. 45, PageID.1254. The Court agrees with Huron Clinton that to demonstrate direct evidence of retaliation, McAfee intends to use Kirbach's statements for the truth of the matter asserted. Yet McAfee has not attempted to show that Kirbach's statements fall under an exception to hearsay or are non-hearsay.

Even if the Court assumes that Kirbach's statements are admissible for the sake of argument, they are not direct evidence of retaliation because the statements do not prove that Huron Clinton's retaliatory intent caused McAfee's termination. Where a non-decisionmaker harbors or conveys retaliatory motives, such statements "do[] not constitute direct evidence of discrimination unless [the plaintiff] can show that [the non-decisionmaker's] views influenced or at least were communicated to, the relevant decision makers." *Weigel*, 302 F.3d at 383.

McMillian acknowledges that Kirbach served on her "management team" and she discussed McAfee's administrative leave situation with him. McMillian Dep. (Jan. 25, 2022), ECF No. 41-11, PageID.716–17, PageID.749–50. But there is no evidence that Kirbach ever told McMillian that the management team under Reese intended to fire McAfee for filing an EEOC charge. Moreover, McMillian made clear that Kirbach "was not a decisionmaker" when McAfee was terminated, nearly

one year later. *Id.* at PageID.749. Without evidence that Kirbach himself was a decisionmaker or that he influenced McMillian to terminate McAfee for retaliatory reasons, his statements are not direct evidence of retaliation. Indeed, as explained below, McAfee has not shown that her protected activity was the but-for cause of her termination even through circumstantial evidence. Therefore, there is no genuine dispute over the existence of direct evidence.

### 2. McAfee Cannot Show a Genuine Dispute of Material Fact on Causation

Because McAfee cannot rely on direct evidence of retaliation, she must prove her case using indirect or circumstantial evidence under the *McDonnell Douglas* burden-shifting framework. Huron Clinton concedes that McAfee has satisfied the first three elements of establishing a prima facie case of retaliation. Huron Clinton admits that it terminated McAfee (an undisputed adverse employment action), that McAfee filed an EEOC charge (an undisputed protected activity under Title VII and ELCRA), and that Huron Clinton was aware that McAfee filed the EEOC charge. ECF No. 41, PageID.380. But the parties disagree over whether McAfee can satisfy the but-for causation element of her prima facie case.

Having thoroughly reviewed the record and the parties' briefing, the sole protected activity McAfee alleges to support her retaliation claim is the filing of the EEOC charge in November 2017, and the sole adverse employment action is her termination in April 2019. ECF No. 44,

PageID.1174 (adopting Huron Clinton's framing of the prima facie case, where filing the EEOC charge and McAfee's termination are the only protected activity and adverse action taken, respectively). For causation purposes, "temporal proximity is measured from the time an employer learns of a protected activity to the time of the subsequent adverse employment action." *Garrett v. Mercedes-Benz Fin. Servs. USA LLC*, 331 F. Supp. 3d 699, 719 (E.D. Mich. 2018). The Sixth Circuit "requires a very brief interval between protected activity and adverse action before [a court] permits a plaintiff to demonstrate causation solely on the basis of temporal proximity." *Sharp v. Aker Plant Servs. Grp., Inc.*, 600 F. App'x 337, 341 (6th Cir. 2015). On the other hand, a lengthy period between the protected activity and adverse action does not foreclose finding causation. But "the more time that elapses between the protected activity and the adverse employment action, the more the plaintiff must supplement [her] claim with 'other evidence of retaliatory conduct to establish causality.'" *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010) (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)).

Given the 18-month span between Huron Clinton's knowledge of McAfee's protected activity and her termination, McAfee must proffer substantial evidence of retaliatory conduct between November 2017 and April 2019 to demonstrate causation. *See Dixon v. Gonzales*, 481 F.3d 324, 335 (6th Cir. 2007). Moreover, especially where McAfee's protected

activity and termination are so far apart in time, the Court must consider "the role of intervening events between her protected activity and her termination." *Sukari v. Akebono Brake Corp.*, 814 F. App'x 108, 113 (6th Cir. 2020); *see also Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 507 (6th Cir. 2014) ("The Supreme Court has expressed a concern that employees who see the proverbial writing on the wall that they are about to be fired should not be able to use Title VII protections to insulate themselves from adverse employment actions that were previously contemplated.").

McAfee alleges three retaliatory events that occurred between November 2017 and April 2019. But none of these create a genuine dispute of material fact over the issue of causation, and are insufficient to sustain McAfee's burden to make a prima facie showing of retaliation. Indeed, intervening events (including the complicated circumstances surrounding McAfee's mental health leave) and Huron Clinton's legitimate actions over this 18-month period make it impossible for a reasonable jury to conclude that McAfee's EEOC charge was a but-for cause of her termination.

First, McAfee alleges that shortly after she informed Reese and Kirbach that she had filed an EEOC complaint in early November 2017, Reese attempted to persuade her to drop the complaint. ECF No. 44, PageID.1176. Because Reese denies ever making such a statement, ECF No. 41-20, PageID.890–91, PageID.892, there is a factual dispute over

16

what Reese said or did. For a factual dispute to be "genuine," however, it must be "significantly probative," such that a jury could find in favor of the nonmoving party. *Anderson*, 477 U.S. at 249. Even assuming a jury would resolve this dispute in McAfee's favor, intervening circumstances and Huron Clinton's legitimate actions after November 2017 cannot support finding causation based on Reese's alleged statement.

For similar reasons, McAfee's allegations that in December 2017, Reese yelled at her when the two disagreed over a minor stylistic issue in McAfee's work product, ECF No. 44, PageID.1176–77, do not create a genuine dispute of material fact. Moreover, it is unclear whether this type of incident can be considered retaliatory as a matter of law. For example, in *Boshaw v. Midland Brewing Co.*, the plaintiff complained of being subject to "hyper-scrutiny" after reporting sex discrimination. 32 F.4th 598, 605 (6th Cir. 2022). But the Sixth Circuit found that the defendant "criticized or reprimanded [the plaintiff] based on legitimate grounds," such that the alleged "hyper-scrutiny" could not be considered retaliatory conduct. *Id.* As both McAfee and Huron Clinton admit, Reese's anger was directed at McAfee because she refused to comply with Reese's preferred capitalization style. ECF No. 44, PageID.1177; ECF No. 41-20, PageID.899. McAfee's defiance of her direct supervisor's orders on making a minor stylistic change (even if her judgment was correct) could validly warrant some kind of censure, and thus would not be considered retaliatory conduct. But again, even if the Court classifies this incident

as retaliatory, intervening circumstances between December 2017 and April 2019 foreclose a connection that establishes causality.

Lastly, McAfee alleges that in April 2018, Kirbach warned her that Huron Clinton management would fire her if she continued pursuing her EEOC charge. ECF No. 44, PageID.1174. But for the same reasons discussed above, the Court cannot consider this evidence as raising a genuine dispute of material fact because McAfee has not rebutted its facial inadmissibility. And even disregarding admissibility issues, the intervening circumstances in the year-long gap between Kirbach's statements and McAfee's April 2019 termination (when Kirbach no longer supervised McAfee) preclude finding causation.

While McAfee's proffered evidence of retaliation falls short of raising a genuine issue of fact as to causation, the record contains considerable proof of events that invalidate McAfee's causation theory. Even setting aside the intervening events related to McAfee's suicidal thoughts and administrative leave (discussed in detail below), the evidence shows that as Huron Clinton Director, McMillian took McAfee's EEOC charge seriously and actively attempted to resolve the charge through legitimate channels. For example, in August 2018 while McAfee was on leave, McMillian wrote to McAfee to emphasize that McMillian "ha[d] not forgotten how important it was to you to be able to talk to me about the issues (in whole or in part) that are the subject of your EEOC complaint and for me to hear your concerns directly from you." ECF No.

18

41-21, PageID.949. McMillian also confirmed that she had reached out to the EEOC about meeting with McAfee in an appropriate setting. *Id.* A few weeks later, McMillian referenced scheduling an EEOC mediation as "a high priority," and suggested that they discuss McAfee's "proposed severance agreement" during the EEOC mediation. *Id.* at PageID.960–61.

The undisputed evidence shows that after April 2018, Huron Clinton management under McMillian's leadership was not focused on using McAfee's EEOC charge as a reason to retaliate against her. First, and most significantly, McMillian's entrance as a supervisor who was not the subject of McAfee's complaints and who expressed clear support for McAfee's EEOC charge, dispels finding that McAfee was terminated for retaliatory reasons. Second, in addition to supporting McAfee in pursuing her rights with the EEOC, McMillian expressed positive interest in McAfee returning to work at Huron Clinton, telling her in August 2018 that if McAfee could be cleared before September 4, Huron Clinton "will be truly happy to have [McAfee] back." ECF No. 41-21, PageID.949. Third, McAfee's serious mental health issues and her inability to obtain return-to-work authorization from a certified medical professional, further disrupt the causal chain. As such, McAfee's allegations cannot raise a genuine dispute of material fact on this issue.

### B. McAfee Cannot Show a Genuine Dispute of Material Fact on Pretext Because of the Honest Belief Rule

Even if the Court assumes that McAfee could establish causation, she is unable to raise a genuine dispute of material fact on pretext. If McAfee made a prima facie case of retaliation, the burden of production would shift to Huron Clinton to articulate a legitimate, nondiscriminatory reason for the adverse employment action. Here, it is undisputed that McAfee was placed on administrative leave after she disclosed her suicidal ideations in documents sent to Huron Clinton's counsel. ECF No. 41, PageID.374; ECF No. 44, PageID.1160. While Huron Clinton contends that McAfee's failure to fulfill its medical authorization requirement to return to work was a legitimate, nondiscriminatory reason for McAfee's termination, ECF No. 41, PageID.386–88, McAfee argues that this justification is pretextual. ECF No. 44, PageID.1179–82. Despite drawing all inferences in McAfee's favor, the Court concludes that she cannot demonstrate pretext because the honest belief rule precludes finding Huron Clinton liable on this record.

### 1. The Sixth Circuit's Honest Belief Rule

Pursuant to the Sixth Circuit's honest belief rule, an employer can "avoid a finding that its claimed nondiscriminatory reason was pretextual" by demonstrating that it "reasonably relied on the particularized facts before it" in taking the adverse action. *Wright v.*

*Murray Guard, Inc.*, 455 F.3d 702, 707–08 (6th Cir. 2006) (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)). "Under this rule, as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001). While a court will not "micro-manage the process used by employers in making their employment decisions," it must consider an employee's evidence that "the employer failed to make a reasonably informed and considered decision before taking its adverse employment action," and thus lacked "honest belief." *Smith*, 155 F.3d at 807–08.

In *Allen v. Highlands Hospital Corp.*, the Sixth Circuit applied the honest belief rule where the plaintiffs alleged that their termination was pretextual because the employer did not have a written policy justifying its response to their misconduct. 545 F.3d 387, 397–99 (6th Cir. 2008). There, the plaintiffs brought suit under the Age Discrimination in Employment Act ("ADEA"), after they were fired for accessing a patient's medical records without proper authorization. *Id.* at 391. The plaintiffs argued that "because the Hospital did not have a written policy regarding the procedures to be utilized in the release of medical records, its proffered reason for terminating them must be pretextual." *Id.* at 397.

21

The *Allen* Court acknowledged that the plaintiffs were "correct in arguing that the Hospital did not have a written policy governing" release of medical records, and even found that "the facts of this case are not a 'textbook example' of a privacy violation for which a hospital would usually take such serious action against its long-time employees." *Id.* But the Court explained that although "the Hospital would benefit from developing a more detailed policy" on releasing medical records, the plaintiffs still failed to create "a genuine issue of material fact about whether [the Hospital's] stated reason for terminating them was a pretext designed to hide age-based discrimination." *Id.* Because the employer had an "honestly held belief" that the plaintiffs violated patient privacy and conducted a "thorough investigation to determine whether [the plaintiffs'] conduct was inappropriate," the Court affirmed summary judgment for the employer. *Id.* at 398.

In *Smith v. Chrysler Corp.*, the Sixth Circuit addressed whether the employer could raise an honest belief defense based on its assessment of the plaintiff's medical history. 155 F.3d at 804, 807–08. The *Smith* plaintiff sought relief under the Americans with Disabilities Act ("ADA") after he was fired for lying about his history of sleeping disorders. *Id.* at 801. In determining that the plaintiff was dishonest in his medical history form, the employer relied on opinions from the plaintiff's treating physician and the plaintiff's statements to another physician "admitt[ing] to suffering from narcolepsy." *Id.* at 808. The Court held that

the honest belief rule barred the plaintiff from showing pretext because the employer reasonably relied on "medically informed opinions" on the plaintiff's health in deciding to terminate him. *Id.*

Similarly, in *Pesterfield v. Tennessee Valley Authority*—a case decided before the Sixth Circuit formally adopted the honest belief rule— the Court concluded that the employer did not wrongfully terminate the plaintiff because of his disability where it "reasonably relied upon the medical report of plaintiff's private psychiatrist and reasonably interpreted its contents." 941 F.2d 437, 443 (6th Cir. 1991). After his supervisors reprimanded him for poor performance, the plaintiff "began to complain of nervousness and anxiety on the job related to what he perceived to be harassment by his superiors." *Id.* at 438. The plaintiff was later hospitalized "for a combination of mental and physical reasons," which the plaintiff attributed to workplace harassment. *Id.* Before permitting the plaintiff to return to work following his hospitalization, the employer required him to "submit a medical summary and recommendation regarding [his] ability to return to work." *Id.* The plaintiff's psychiatrist wrote to the employer's physician detailing the plaintiff's mental health issues, including depression, anxiety, and possible suicidal ideation "if his condition failed to improve." *Id.* at 438– 39. The report also recommended best practices "[i]f there is any possibility of [the plaintiff] returning to work," but concluded that

23

permitting the plaintiff to retire "may be the best answer" in his current condition. *Id.* at 439.

Based on this report, the employer's physician "concluded that the plaintiff was unable to work safely and refused to clear plaintiff medically to return to work." *Id.* The employer later terminated the plaintiff because he could not obtain medical clearance to return to his job and the employer could not provide reasonable accommodations. *Id.* The Court affirmed the district court's grant of summary judgment to the employer because "the most reasonable interpretation of the letter was that plaintiff was not ready to return to work." *Id.* at 443. Furthermore, the Court explained that even if the employer "was mistaken in its interpretation . . . there is no proof that [the employer] based its decision to terminate plaintiff" because of his disability. *Id.*

### 2. McAfee Cannot Refute Huron Clinton's Reasonable Conduct Under the Honest Belief Rule

McAfee argues that she has raised genuine issues of material fact on pretext in two main ways. First, McAfee claims that McMillian did not act pursuant to written policies in placing her on administrative leave and requiring her to satisfy a medical certification requirement. ECF No. 44, PageID.1179–80. According to McAfee, the absence of written policies renders her termination pretextual. Second, McAfee contends that Huron Clinton misconstrued Dr. Forsberg's conclusions on McAfee's ability to return to work because Dr. Forsberg "never concluded or certified to

Huron Clinton that Plaintiff was unable to return safely to the workplace." ECF No. 44, PageID.1180. Both arguments fail as a matter of law under the honest belief rule.

### a. Huron Clinton's Lack of Written Policy Does Not Constitute Pretext

While Huron Clinton has not meaningfully rebutted McAfee's contention that McMillian did not act in accordance with written policies, McAfee cannot meet her burden to show that Huron Clinton's justifications for firing her were pretextual or that Huron Clinton acted unreasonably. McAfee does not dispute that she expressed suicidal thoughts in a document disclosed to McMillian. Although McAfee disagrees with Huron Clinton's framing of her intent to harm herself and others, the factual record makes clear that in describing her mental state, McAfee graphically conveyed to Dr. Forsberg that she considered committing suicide at work "so that [Huron Clinton] would have to acknowledge what happened to me." ECF No. 41-6, PageID.475.

McAfee also testified that she was "really distraught" during the June 14, 2018 meeting where McMillian placed her on administrative leave. *Id.* at PageID.511. McMillian similarly recalled that McAfee was "very emotional" when they talked about her suicidal thoughts at this meeting. ECF No. 41-11, PageID.698. McMillian further testified that she had experienced coping with the suicide of a former coworker, which made McMillian "tremendously concerned" about McAfee expressing

suicidal thoughts. *Id.* at PageID.689. Thus, there is no genuine dispute that at the time she was placed on leave, McAfee presented serious mental health concerns that reasonably required McMillian to act even without a written policy.

And in the process of placing McAfee on paid administrative leave, McMillian conferred with Huron Clinton HR Director Randy Rossman, who confirmed that "there was nothing contractually to stop" McMillian from placing McAfee on leave. Rossman Dep. (Feb. 1, 2022), ECF No. 47, PageID.1419–20. Rossman also testified that even if there was not a written policy on the issue, he recalled "many times" where Huron Clinton ordered a Fitness for Duty exam before permitting an employee to return to work after leave, just as it demanded of McAfee. *Id.* at PageID.1421–22. Rossman also clarified that Huron Clinton required other employees to obtain "a release that [the employee can] return to work . . . from the doctor." *Id.* at PageID.1422.

In addition, while McAfee was on leave from June 2018 to April 2019, she communicated regularly with McMillian and Huron Clinton HR Benefits Administrator Sandra Burns about completing the Fitness for Duty exam with Dr. Forsberg and obtaining medical clearance from a board-certified physician. *See* Exh. 19, ECF No. 41-21, PageID.921–66 (exhibit collecting email correspondence between McAfee and McMillian regarding Huron Clinton's medical clearance requirement, McAfee's

difficulty in finding a private physician/psychiatrist, and McAfee's appointments with Dr. Forsberg).

McMillian and Burns consistently provided substantive advice, identified potential resources, and used an empathetic tone in discussing these requirements with McAfee. *See, e.g.*, *id.* at PageID.940 (email from McMillian to McAfee advising McAfee to "not be super stressed or worried," and providing assurances that "[w]e will all work together and figure it out"); *id.* at PageID.944–45 (email from Burns to McAfee advising McAfee to use Ulliance, a resource Burns had identified for finding a doctor and confirming that Burns "just spoke with the folks over at Ulliance and they said they could help you find a doctor in your area that would have openings right away"); *id.* at PageID.949 (email from McMillian to McAfee expressing that "if you are authorized to return to work before September 4, we will be truly happy to have you back").

At no point did McAfee challenge McMillian's authority to keep her on administrative leave or to require her to undergo a Fitness for Duty exam and obtain medical certification. In fact, McAfee repeatedly expressed her gratitude to McMillian for providing her with extensions to comply with these requirements, and even questioned her own ability to return to work safely. *See id.* at PageID.953 (email from McAfee to McMillian explaining that she was experiencing "fear and panic attacks" when visualizing herself returning to work, and noting that "[b]eing able

to spend this time away from the office and talking to [Dr. Forsberg and McAfee's private psychologist] very likely saved my life").

Just as in *Allen*, Huron Clinton's conduct cannot be considered pretextual under the honest belief rule. McAfee offers no evidence that McMillian's concerns about McAfee's mental health were disingenuous or intentionally overblown. McAfee has not shown that McMillian acted unreasonably in placing her on leave, requiring her to obtain medical certification, and ordering a Fitness for Duty exam. Relatedly, McAfee cannot demonstrate that Huron Clinton wrongfully obstructed her ability to meet the medical certification requirements to pretextually terminate her. Instead, the undisputed record clearly reflects that McMillian and Burns diligently assisted and supported McAfee through the process.[1]

---

[1] The Court notes that neither party explains why McAfee did not obtain medical certification. Even accepting that McAfee's earliest return to work was inevitably deferred due to delays in getting a psychiatry appointment, McAfee stated that she had found a psychiatrist available by September 2018. ECF No. 41-21, PageID.940. There is no evidence that McAfee ever sought medical certification from the earliest available psychiatrist or any physician. To the contrary, the record shows that McAfee continued to see non-physician therapists when she was on notice that she could only obtain medical authorization from a board-certified physician. *See* Forsberg Dep. (May 9, 2022), ECF No. 45-2, PageID.1304–07 (summarizing Dr. Forsberg's awareness that McAfee had been receiving mental health treatment from a licensed psychologist who was not a physician); McAfee Dep. (Jan. 24, 2022), ECF No. 41-6, PageID.514–15 (admitting that McAfee sought medical certification from professionals who "did not meet the particular medical certification that HCMA was requesting"). But because the Court must construe all

In sum, the undisputed evidence shows that Huron Clinton acted reasonably in response to McAfee's suicidal ideation, and continued to take reasonable steps in ensuring that she could return to work. No reasonable jury could conclude that Huron Clinton acted pretextually to terminate McAfee, even though McMillian did not act pursuant to written policies.

### b. Huron Clinton's Reasonable Reliance on Dr. Forsberg's Fitness for Duty Conclusions Is Not Pretext

McAfee insists that Dr. Forsberg never actually concluded that McAfee was unable to return to work, making it unreasonable and pretextual for Huron Clinton to justify her termination based on Dr. Forsberg's reports. ECF No. 44, PageID.1167–68, PageID.1180. In McAfee's view, Huron Clinton "should have accepted Forsberg's opinions and permitted McAfee to return to work," rather than pretextually firing her. *Id.* at PageID.1181. Specifically, if Dr. Forsberg's report indicated that McAfee was fit to return to work, McAfee contends that McMillian's interpretation of Dr. Forsberg's opinions was "simply wrong and contradicted by Forsberg's own testimony." *Id.* at PageID.1181–82. But the factual record undermines McAfee's argument and supports Huron Clinton's reasonable reliance on Dr. Forsberg's opinions at the time they were issued.

---

ambiguities in McAfee's favor, it does not consider these factual gaps to support granting summary judgment.

McAfee correctly points out that Dr. Forsberg's August 2018 report indicates that McAfee was "no longer suicidal or having suicid[al] thoughts," and that McAfee exhibited "significant improvement in her mental health status since the start of this evaluation in July 2018." ECF No. 41-18, PageID.823–24. But Dr. Forsberg also repeatedly emphasizes that despite these improvements, "it is not recommended that [McAfee] return to work." *Id.* at PageID.823. And even after McAfee had been on leave for approximately two months, Dr. Forsberg concluded that "[i]t is also not likely that she will be able to return to this workplace in the future." *Id.*

Furthermore, Dr. Forsberg based her conclusions on psychological tests showing that McAfee was "functioning at a very low level of psychological efficiency," including "having difficulty managing routine affairs." *Id.* at PageID.818. Dr. Forsberg also opined that McAfee was "at medium high risk for job performance concerns" and "lacking in self-confidence, sociability, and social poise." *Id.* at PageID.819. Relatedly, although Dr. Forsberg noted that McAfee was not suicidal by late July 2018, Dr. Forsberg's report contains several references to McAfee admitting that she had suicidal ideation in testing and clinical interviewing conducted throughout July 2018. *Id.* at PageID.818, PageID.820–21.

In letters to McMillian, Dr. Forsberg concisely articulated that McAfee was psychologically unfit to return to work. For example, on July

30

24, 2018, Dr. Forsberg wrote that "[i]t is also my professional opinion that [McAfee] is not fit for duty at this time." ECF No. 41-17, PageID.804. McAfee makes much of the fact that Dr. Forsberg opined that McAfee was not suicidal and "could become psychologically fit for duty" if she followed Dr. Forsberg's recommendations. ECF No. 44, PageID.1162. But Dr. Forsberg unequivocally stated that she considered McAfee unfit at the time she summarized her opinions for McMillian. On August 27, 2018, Dr. Forsberg again concluded that "McAfee is still not psychologically fit for duty and will not be fit for duty on September 4, 2018." ECF No. 41-18, PageID.806. In extending McAfee's leave and insisting that McAfee obtain medical certification to return, McMillian acted in accordance with the only reasonable interpretation of Dr. Forsberg's opinions.

To the extent that any of Dr. Forsberg's 2022 deposition testimony contradicts her 2018 reports and letters, these inconsistencies are ultimately irrelevant to assessing pretext. Under the honest belief rule, the Court must evaluate whether Huron Clinton's reliance on Dr. Forsberg's conclusions was reasonable and whether Huron Clinton acted reasonably based on "the particularized facts that were before it *at the time the decision was made." Smith*, 155 F.3d at 807 (emphasis added).

Moreover, when viewing Dr. Forsberg's deposition in full, it is clear that the excerpts relied upon by McAfee present a misleading picture. Although Dr. Forsberg testified that she did not believe McAfee to be a

danger to herself or others, Dr. Forsberg emphasized that she "did not think it would be good for [McAfee] to go back to work." Forsberg Dep. (May 9, 2022), ECF No. 45-2, PageID.1304. Dr. Forsberg reiterated her conclusion that McAfee "would have to be reevaluated before returning to work," and underscored that she "was concerned about [McAfee] and in turn [Huron Clinton]." *Id.* at PageID.1304–05. And in line with her 2018 report, Dr. Forsberg testified that McAfee's psychological testing results exposed "very serious" concerns. *Id.* at PageID.1316.

On this record, McAfee's arguments that McMillian acted pretextually by irrationally relying on Dr. Forsberg's conclusions or deliberately misconstruing Dr. Forsberg's opinions must fail. As in *Pesterfield* and *Smith*, the record here shows that Huron Clinton reasonably relied on Dr. Forsberg's opinions regarding McAfee's psychological fitness and reasonably interpreted Dr. Forsberg's conclusions.

McAfee was ultimately terminated because she failed to obtain the required medical authorization to return to work after presenting serious mental health risks. No reasonable jury could reach a contrary conclusion. Therefore, McAfee has not created a genuine dispute of material fact as to pretext, and her retaliatory discharge claim must be dismissed.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (ECF No. 41) is **GRANTED** and this case is **DISMISSED with prejudice.**

**IT IS SO ORDERED.**

Dated: October 27, 2022    s/Terrence G. Berg
                           TERRENCE G. BERG
                           UNITED STATES DISTRICT JUDGE